and they used 21-55118 and 21-55157. In this case, each side will have 20 minutes. Good morning. This is Jack Sleaf, appearing on behalf of defendants and appellates T.J. Zane and Michelle O'Connor-Ratcliff. I'd like to jump right in and talk about our work. I want to talk about word filters. I think it's important for two issues in this case. The case was filed in 2017. The conduct occurred in 2017. The defendants blocked access to their Twitter and Facebook accounts. In the next year, Twitter and Facebook changed their rules and permitted words to be blocked. My understanding is that that procedure actually goes back much further. Is that wrong? I don't know how far back it goes, and I know that the rules change frequently. But what we have in the record is these two defendants became aware of it. I don't know that that matters, but okay, go ahead. They were aware of it, and they made the change in about December of 2018. And that takes this out of a public forum. Nobody could then make any kind of a post on both sites. I thought they could still do the like, dislike, whatever it is. And also, in Twitter, I thought that this thing didn't operate. The word thing only applies to Facebook. Are you making a mood disorder? Is that basically what you're doing? No, not a mootness argument. I'm arguing that it comes out of the forum. It's no longer a public forum if it ever was. Well, that only matters if the rest of the case is wrong. Well, I guess it would be a mootness argument, too. But this also goes to the second issue. The court ruled that this was a properly tailored limitation, time, place, and manner limitation. Can I go back to ask you about the post-2008 change? So you said it takes it out of being a forum at all, but why isn't it still a limited public forum on Facebook where people can do a thumbs-up or some other kind of icon? Aren't they still able to react so there is some communication that the public can still do? There is some. As I understand it, there's still some communication, but you're right. The thumbs-up or the thumbs-down or the like or no like, but the ability to post video, post arguments, post anti-campaign material would be completely blocked, and that takes it out of the kind of interaction that we would normally associate with a public forum. I agree that it has to not be a full public forum, full designated public forum anymore at that point, but it seems like it is still some sort of forum because you still have people expressing themselves in some way in that forum, even if it's a limited one, and so there would still be rules that would apply to that. Do you disagree? No, I think that makes good sense, but we need a rule. So there are rules for limited public forums, and usually you can't have unreasonable restrictions, and I don't really understand why it is a reasonable restriction to stop someone from doing a thumbs-up or a smiley face. We wouldn't be stopping them from doing a smiley face. But you are because they're blocked. The plaintiffs are blocked. They can't do a thumbs-up because they're blocked. I see your point. So is there any reason to be blocking them from doing a thumbs-up currently? No, there isn't. And so it seems like that is a problem because they're currently being blocked. So, I mean, maybe there's some room for settlement here, but the main claim that is still alive in this case, it seems like you just admitted they should win. It's the state action, which you haven't discussed. I mean, the interesting and hard issue in this case is the state action issue, and you don't seem to want to talk about it. I do want to talk about it, but I think the word filters informs that issue. Why does it inform the issue? Well, the timing. The court ruled that after three years of litigation, somehow they should have been unblocked, and there's no offense that occurred that would have put them on notice. We told them not to do it because that would tend to look like they were being unblocked. But you're assuming that that was the only thing that was wrong with what they were doing before in terms of narrow tailoring, and that all assumes that there is state action and that there is a public forum. So, we're starting at the back end, and if you want to concede all the rest of it, we can start at the back end or else we should start at the front end. I don't want to concede that. I'd like to come back. I didn't have any luck on the MSJ or at trial on the argument that this isn't a public forum. The two big reasons that we offered, we listed a number of bullets, but the two big reasons are that the district has its own method of communication and the district had absolutely no control over these sites that were independently created as campaign sites by these two members. And the third reason that we thought was particularly important and has been at limited address in any case is that these are legislators, and a legislator cannot make an official action except in a board meeting after a properly noticed meeting with a motion and a vote. That's where legislators can act, and there's no way that they could do anything outside of the meeting in their site that would be official action. They could report something that happened. They could make a campaign promise, but they could not act independently. The Trump case, President Trump did things on his Twitter account that were essentially state action. But communicating with constituents and collecting information and communicating information are not part of their jobs? No, I'm not contending that at all. I'm contending that that's not a function of these two websites, of these two areas. So in that case, the fact that there are legislators isn't the issue, because legislators do have official roles. They're representing people, so the act of representing people would seem to be an official capacity. I see your point, but I don't agree because they can't do anything on the website. They can represent their clients, but they intended these to be bulletin boards. They intended these to be like yard signs, like a sign on the side of the road that says the card vote. The problem is that this medium just doesn't lend itself to that, because it isn't a bulletin board. And it allows people to communicate, and they did allow people to communicate back to them. If they had a website, it would be different. Maybe they did have a website, but this medium is an interactive medium. It was their intention that it not be an interactive medium, and they did everything in their power to keep it. So why didn't they post something from the beginning then saying no one should comment on this website? I guess they could have, and it's true that they didn't. There's nothing in the record to indicate why they didn't. I don't think they saw this coming. Something saying you may comment, but no more than X lines, and don't repeat what you've already said. There was no rule. There was no rule, and it would be completely appropriate to do that, and I wish they had. But the one thing that I would say is the use of Facebook and Twitter in campaigns is relatively new, and there isn't a lot of case law on it. These folks are both well-educated, but they didn't see that issue coming until it came. And when it came, the court ruled that they were really being spammed and harassed, and that it was appropriate that they block them. And my key argument here is there's no event that if the Garniers had sent a letter saying that they're sorry and they won't do that again, then we certainly would have unblocked them. But nothing like that happened. The only thing that happened was the passage of time. But the problem is that because there were no rules, it is extremely amorphous. In other words, I mean, there is an easy fix. It's just freelancing. It's put a sign-up thing on the website that says either we don't want any comments or we don't want any comments of more than three lines or we don't want any comments that repeat comments you've already made or anything like that. And what would we do if that happened? That becomes the problem. If we had a rule. Hide it or remove it. Removing it is no big deal, as I understand it. To me, it's not difficult. If there's 220 posts, it is a problem. I thought, wasn't it Zane who testified that it actually was not a big deal to hide posts? He did. He testified that it wasn't a big deal to hide one. But hiding 220 or 2,000 becomes a problem. And the Garnier's had a long history with this district of attacking. There had been litigation before. So I don't know what to do with that testimony by Zane because I actually am inclined to agree that having to hide 200 comments sounds onerous. But it seems like he testified that it wasn't. So what should we assume for purposes of deciding this case? You should decide that it would be onerous because it's logical. And that he was answering a question about is it hard to remove what. Mr. Sleeve, are you asking us to re-weigh the factual evidence that the district court had because we've got some factual findings here that go the other way? I'm not asking you to re-weigh. I think that there's only a couple of disputed facts. I think the facts were well found. But isn't it also true or is it also true that, in fact, the way these things appear on Facebook. Now, I'm not on Facebook. I don't participate on Facebook. I don't think judges should participate on Facebook. But it is my understanding that, from what I've been told, that what appears on Facebook is not the whole post. It is a couple lines. You have to click on it to actually see it. That's correct. But 240 of them are. 240 was actually Twitter. At a 20, you can't even. You have to go and open each individual. It was for 240 different tweets. And you'd have to go to each distinct tweet to open anything that went to that tweet. Is that right? I think that's true. So it's not true that there were 240 posts to a single tweet. There were multiple. I don't want to put 240 to it. I shouldn't have said that. There were multiple tweets. The number hit 200 in several different places. And I don't remember exactly the number. If anybody was going to look at it, you'd have to go to each earlier tweet and then open the comment. That's true. But if somebody sprayed paint over a campaign sign, it wouldn't complete it. It's not the same. That's the point. It's not at all like that because they're not covering up the campaign sign. And they're not even annoying people who are looking at the last tweet because there's only at most one comment to that tweet. But if somebody wanted to look at the tweets before it, then they're completely cluttered. But they're not covering up the tweets. They're not covering up the tweets. I agree. But there is clutter on your site. But there's not really clutter, right? I mean, this is the question, I think. If the observer needs to click to create the clutter, I don't really understand how that counts as clutter. Well, the court found that it was. The court found that it was appropriate to block them because it was clutter. If the issue here is whether or not the judge was right on those facts, that's a different issue. That's not a fact. I mean, that's not a fact. That's a conclusion. He didn't find that it wasn't true that you actually had to click on it. He did not. But what he found was that it was interference with their message and that it was appropriate to limit it. Now, the question in my mind is when would it be appropriate to unlimit it? When should they have been unblocked? The question is was it appropriate to limit it the way they eliminated it? I mean, as we've already said and as you've said, there were easy ways to limit it, to post a notion saying no repetitious comments are allowed. I don't agree at all because the history with these people is they would post multiple posts anyway. There was no such limit. There was no such communication. Because it wouldn't have been effective. Well, how do we know that? Because he didn't try. That's true. But the record is replete with the trouble this district and these members had with this family. And the evidence is such that you could easily conclude that a rule that they not post multiple postings wouldn't have had any effect on these people at all. And then you'd be going through and removing all of those, all of the clutter that the court found was black. I mean, that might be. But if you had posted a rule, I mean, maybe they would have obeyed it so that they could continue to post. If they didn't, it seems like you'd, at that point, have a better basis for either hiding their posts or potentially even blocking them eventually. But because you skipped those steps, I don't really understand how you can get around the fact that there should have been rules if you were going to try to say this is a forum with rules. I think that you're absolutely right. It would have been better for me in this argument if we'd had rules. But we didn't think of that. And the court ruled that it was appropriate that we block them. And I can't see any reason in the world that somebody should unblock during litigation. Isn't it a legal conclusion that it was appropriate to block them? I mean, we have to figure out whether that was right. So I don't think we can take that as a given. That issue is to know that's true. It's a mixed question of the fact applied to the law. But the court determined that it was appropriate, based on the facts, to block these two people if the court's going to approve that. Let's take the post-2018 period, right? Now that there is no clutter, the worst thing they could do is put a thumbs down or a frowning face or something, right? Yes. But they're still blocked. But they're only still blocked as a result of the litigation, not as a result of any change in events. Nothing has happened that's different. So you're saying if they haven't sued, they wouldn't be blocked? No, I'm saying that during the pendency of the lawsuit, during those three years that the district court considered to be important, nothing happened. There's nothing that would indicate to somebody that they should unblock them. What about changing the whole nature of the platform? I mean, when they did the word filters, it changed the nature of what they were offering. So isn't that a change that could have led to unblocking? I suppose that it could have. And D.J. Zane testified that he hadn't really blocked them. The court found that against you, and that seems like a fact. I agree. I should reserve my time. Thank you. Thank you, counsel. Let's hear from the other side. May it please the Court, the Court of Corrections for Mr. and Mrs. Garnier. If we could start with the state issues, one of the authority of the state. We have individual members of a legislative body. Each one is an elected official. They set up the websites as government officials. That's what they called it. That's how they labeled it. That is the information that they put out there. However, is it true that the district did not create these websites for any of its trustees? Did all trustees have one? I don't know the answer to that question at this moment. I believe that there were others among these two, but I don't want to sit here and tell you that all five of them. But the district itself has a separate website, does it not? Yes, that's true. The district has a district Facebook page, and the district has a Twitter account. Does it link to these two trustees' websites? It links when somebody who posts. I believe the term is tagging. When you post, you put in the information that connects to the other person's Facebook page. It's like a hot link. In the briefing that we provide you, we have to use hyperlinks. It's the equivalent for social media. Okay, but I'm like Judge Berzano. I'm not on Facebook for all the reasons she articulated. So forgive me if my questions sound a little ill-informed. I know only what you've told me already. All five of us are at a disadvantage here. Okay, well, what we don't have, as I understand it, is an actual official link on the school district's page so that if it links, it will take me to Ms. O'Connor's page. That's true. You would have to go into Facebook or into Twitter and do a search for Michelle O'Connor to wrap that up. Is this public or do you have to be a Facebook member to get to this? No, anybody can go to these pages. And on the issue of whether the district is creating these pages, it's important to remember that these services are free. Anybody can go have a Facebook page. You just have to sign in and create the page. It's not as though the district has to pay for it in order for a trustee to have it, and it's not as though you have to have a district employee providing the content. In fact, the testimony at trial from both defendants is that they were the sole producers of the content. It was what they wanted to put out to their constituents. So in order for this to be done under color of law, state action, I mean Michelle O'Connor had a website. I mean aside from the headings on them, which was government officials, and Zane's case is something more specific about his role and so on. So certainly if you looked at it, you'd think this was, and they had personal websites too. This was not a personal website. And Jan has a campaign website, but it seems to be functioning as part of their communications with their constituents. I mean, for example, at one point O'Connor had this page, an invitation to provide important public input via PUSD, Director of Communications, and then it goes on in the weeks to come, we need your help, and so on and so on. And certainly if somebody had read that, you would think that this was somebody operating in their official capacity, asking, telling people how they need their insight for the elections and how to do it. But we agree, Judge Berson, and that is what the district court concluded as well. There is ample evidence here that these social media accounts were operated as, were the functional equivalent of, had the effect of being official modes of communication that these two legislators used. I mean, it appeared to be official. Behind it, maybe it really wasn't official in a sense that nobody had authorized it, but it certainly appeared to be official. And I think if the district actually posted on its own website agendas and instances of upcoming board meetings that the public would be invited to come and comment, right? Judge Tolman, if you look at the document here, evidence that we included, there are printouts from the Facebook pages. You can see them cross-posting. So you can see where if the district posted an agenda, the defendants would also post the agenda and refer to each other. I think you can see that in the document. But I'm not sure that answers the question that we're trying to tease out here, which is at what point does someone's, let's say a candidate for election, at what point does that person's website become an official website as opposed to a personal political website? And the fact that they duplicate an agenda that is officially posted on the school district's website, in my mind, doesn't necessarily answer the question because the whole purpose of these social media accounts is so that everybody can comment and share information cross-platform, right? That's a fair question. And the answer is that it becomes their official page when, one, they're sworn into office, and two, they convert the page to substantially deal with official school district business. These schools or social staff just answer re-election every four years, do they not? That is true. So I'm having a hard time figuring out where we draw the line. If somebody, clearly if someone has not yet been elected to public office and they establish a social media presence and they put material on there to tell the public why they should vote for them as a school board member, it can't be an official site until they're actually sworn in, right? That's true. Under your theory here. And so then the question becomes what more, besides being sworn in, do we have to have before we conclude that it is now a public forum of some sort, limited or not? Yes, fair enough. Once they're sworn in, and technically before that would be after election day, the campaign is over. There is no campaign that's going on. If that's the case, though, then every member of Congress who has to run for re-election every two years who has a website has created a public forum, even if the sole purpose of the website is to continuously run for re-election, which it seems to me they're always doing. Let's be careful here, Your Honor. If you need a website which is a one-way communication, that might be one thing. We're talking about social media accounts where you have now elected officials who are both sharing official information and soliciting feedback from their constituents. Now, your point about... That was a feedback from a candidate who wants to encourage potential voter support from soliciting feedback as to the candidate's political platform in order to respond to future concerns that will come when they are constituents. I mean, it seems to me that just being sworn into office doesn't immediately transform their social media platform into a public forum. There has to be something... I don't think I said that. What I said was, number one, they have to be sworn in. They actually have to be a public official. And number two, the site has to be used to such a substantial degree in the vein of official communications. Which is what the Eighth Circuit focused on, right, when it decided that this was not state action. Because in that case, the legislator hadn't really done anything more than keep telling potential supporters, look, these are the promises I made to you when I was a candidate for office, and here's how I'm performing and carrying out my promises. And then he decided that that's not a public forum. And then you should go look at the actual posts so you can see that that's not what these defendants are doing. They go substantially beyond saying to their constituents, this is the promise that I made and this is how I'm keeping the promise. So I would like to move on. I have some more questions about the state issue. I wanted to talk about a couple of other issues. Is that how it's pronounced, Garnier? Yes, yes, sir. Did they ever create their own website so that they had a platform to express their views about what the school district was doing, their concerns about race relations and the former superintendent who was engaging in malfeasance in office? They had their own Facebook accounts, and Mr. Garnier had his own Twitter account. And regularly attended the board meetings to express their displeasure in person as to what the board was doing? It sounded like they were pretty active parents and constituents. I don't think anybody disputes that. Your question was about whether they regularly attended board meetings. My understanding is that they did regularly attend, but I don't know whether that means at every monthly meeting or they were reliable when certain issues were coming up. There's no evidence in the record as to the frequency with which they attended. I was asking you this series of questions, again, to try to figure out where we draw the line here because, in essence, they're complaining about being able to express their thoughts and concerns and reactions on the individual trustees' pages, but they clearly had other alternatives and availed themselves of those alternatives. Let me finish my question to air their grievances with the school board. I think that's actually not quite correct, Your Honor. The interesting thing about the social media pages is that's where the defendants put out the information that they want shared. At school board meetings, you have what's on the agenda. It's not a place where you get to have a dialogue with the board members. In fact, that's testimony during the trial. They never solicit public input at a school board meeting? No, they will let you make public comments, but one of the things, and Mr. Gurney testified to this, is that they were also trying to get information, feedback, and have a discussion, have a conversation about certain issues, race being one of them, how certain students were treated being another issue. And you can't actually have that conversation at board meetings unless that's on the agenda and the board members choose to engage in it. To switch gears a little to the question of the tailoring here, if there had been notices of the kind that we were discussing earlier, i.e. if the headings on the Facebook page had said either we don't want any comments from the public or any comments should be at least not more than three lines or any comments may not be repeated or anything like that, and your clients had defied those instructions, would this case be the same or different? Would it matter? I think it would be different because the Constitution does allow reasonable time, place, and manner restrictions. And so if there were manner, I think it would be manner in the social media context, not really time or place because it's online and you can do it 24-7. But in terms of manner, if you had reasonable restrictions in place, and I'm assuming that what you're positing would be a reasonable restriction, if they have that and you violate them, yes, you can be removed. Could I ask you a few questions about what is still at issue in this case? And it kind of relates to this. Sure. On ER 30 in footnote 4, the district court said that you were not challenging the hiding or deleting of the Garnier's individual comments. Is that right? Do we not have to worry about whether when all that the defendants were doing was hiding messages that they didn't want, whether that was okay to do or not, or that's not before us? Yes, Your Honor. When that question was put to us below, my client's purpose was to be able to engage in the conversation. And as long as their comments were there long enough to be seen and evaluated, if somebody then decided, meaning the operating account then decided, I've seen it, I've read it, I've considered it, not important. We weren't challenging that decision. Okay. So even though there wasn't a title saying you can't do repetitive comments, you're not really challenging the hiding of the repetitive comments. That's not important. Once the comment was digested by the defendant and the public had an opportunity to see it, that was the purpose. Okay. And the objective will have been achieved. Okay. That's really helpful. So then another question. Is it like this? So do we need to decide whether the blocking of the Garnier's before the word filter change, so the pre-2018 blocking, do we need to decide whether that was okay or is that not really an issue anymore because the website has changed? You do have to decide for a couple of reasons. Number one, the evidence is conflicting and the court ultimately went our way. The blocking, if that is in fact what is preventing my clients from any interaction whatsoever, it has the effect of a complete block. That's a different question. So you might be asking now, please unblock me so I can put a thumbs up. That's one question. It seems like we need to decide that. But do we also need to decide whether back before 2018, there was a constitutional violation in blocking the comments? Or is that not an issue anymore because it's moot? I don't think that issue is moot because, number one, there's a dispute in the evidence over when the word filters took effect and whether they were actually being done. It doesn't exist on Twitter at all. So it's not an issue for Defendant O'Connor Wreck. I understand that Twitter is still an issue, but as to Facebook, do we need to decide whether it was okay to block from Facebook before 2018? I think you do if you agree with my client on the qualified immunity issue as to the damages. If we're only talking about the presumption of belief. If we didn't, we would have a classic mootness question, which nobody here has actually briefed as a mootness question. But it would appear, and maybe we need briefing on the mootness question, but no one has said that they would have the defendants committed to keeping the word filter on forever or to not blocking them. In other words, it's in this voluntary cessation, which can be undone at any time in terms of mootness. That's right. It's not a permanent change. They can change the word filter on any given day. Also, there is a question. At trial, they couldn't indicate which words were being used. There's some testimony that they tried to use such general words that anything would be blocked. But if you then go look at the documentary evidence, you still have recent posts leading up to trial where people are putting extensive comments. That's interesting. I thought the factual assumption we were operating under was that there are no comments post the word filtering on Facebook. That is what the defendants want the court to believe. They did testify that there are word filters. But if you go look at the documents themselves, they show when the comments in the posts were made. And that is at odds with the use of a word filter. Well, this is odd because the district court seems to have assumed that the word filtering was really stopping comments, and I didn't read your brief to say that was a clearly erroneous fact. So now I'm a little bit confused about where we are with this. I'm not trying to get you to go against the district court on this issue. I was simply trying to respond to your particular question. So it seems like you think the earlier thing is not moot because they might undo the word filtering. The later thing we need to decide is, okay, third question, are you challenging the word filtering? So are you challenging the move from allowing comments to not allowing comments, assuming that is the facts we're operating under? Are you challenging the closing of the forum, in other words? No, but I want to be very precise. The word filtering is not what closes the forum. By definition, the forum remains open as long as you're not using those particular words. What they could have easily done when they created the account, and there was evidence on the summary judgment, I believe, and actually it may be a trial, but for sure the summary judgment, that if you don't want to allow comments when you create your page, you simply check a box that says no comments allowed. So they could have disallowed comments. I don't know if that's right or not. I don't think we have a finding on whether that's right. What we do have is it seems a finding that they at least didn't know they could do that, and so they learned it in 2018. They put on filters, and I think we need to operate under the district court's assumption that the filters really changed at least the nature of the forum. Maybe it didn't close it entirely now. It could be a limited public forum where all you could do is thumbs up or smiley face, but it seems like the district court assumed that it became a different, at least a different kind of forum. Do you agree with that? Yeah, I wasn't saying that there was a finding on it. I was just pointing out that there is evidence in the record. I would be curious to have a letter telling us what pages we should look at to see that. Because I don't know. I'm happy. It's a little hard to actually see the dates on the Facebook pages that we have, at least from my iPad. So it would be helpful to know what we should look at to have this factual dispute. But let's just for a moment assume we don't have a factual dispute and there was a change where it went from you could comment to you couldn't comment, and all you could do is thumbs up or smiley face or frowny face. Are you challenging that change? If the change applies to everybody, we're not challenging it. If it applies to my clients, we're challenging it. So you do want to say your clients should be allowed to participate in the thumbs up version of the forum, but you're not saying it was unconstitutional to change the nature of the forum? You're correct on both of those points. Judge Friedman? I think I'm over on my time. If the court does have questions for supplemental briefing or if Judge Berzon or somebody wanted my colleague and me perhaps to give you an agreed statement of the dates of certain postings, we probably could provide that. I'm just not sure. I appreciate that, but we'll let you know. Maybe we'll issue an order that asks for what we want after we are able to confer. Okay. I'm over on my time. Thank you very much, counsel. That's very helpful. Let's hear for rebuttal, please. I think you're muted. Always awkward, isn't it? I wanted to make one comment about the idea of a distinction between social media and websites. Social media has become extremely important to candidates, and I'm sure the court is aware how large Facebook has become and Twitter has become in campaigning. Whether we're talking about congressmen or school board members, it's really important to have some ability to put your message out on social media without being harassed. Does the record show what was just represented, which is that you could actually put these out and check no comments and there would be no comments? Is that in the record? Do you know if it's true or do you know if it's in the record? I'm not sure if it's in the record. I think it's probably true. Okay. But you don't know if it's in the record? I don't know. I don't recall that that was discussed. If it were true, it would seem a little odd for your clients not to have used that instead of going through this word filter thing, which is obviously a much more complicated way to do the same thing, if that's what they were trying to do. Well, I'm not sure that they knew that, and I'm not sure if I would have known that if I hadn't been involved in this litigation for three years. And also, with regard to the question of whether there were comments on the pages after the representation word filtering, do you know whether the record shows that? I didn't think that that was true, and I didn't think that the record showed it. But I agree with the court. It became difficult to see exactly what was on those pages after they were created, and I never did have a really good understanding of how they felt. If I was looking at them online, there's a great deal of difference between looking at a thing online on Facebook and looking at it when it's been reproduced and put into the record. So I'm not sure. I don't think that's right. I don't think that my understanding was there was nothing that could go up after the word filters were put in place except a thumbs up, a thumbs down, maybe a smiley face, something like that, but not a series of words. As long as the, if you blocked the, you would block the statement that had the word the in it, but if you could construct a sentence that didn't have a blocked word in it, the phrase would come through. But the filter's got not just the words, but the sentences that the words are in. That's what I understood. Really? It doesn't just chop out the word. It's not a redaction tool. It blocks the whole comment if it has one of the words in it. So the appropriate thing to do would be pick all the definite and indefinite articles and all the pronouns, and you'd probably stop all comments. You could probably list a list of dinosaurs or something. Like if you wanted to put ten names of dinosaurs up, you could probably get through it, but no one is doing that it sounds like. I agree. And T.J. Zane said that he put 2,000 words in his. That's in the record. And all the other evidence was negative. That sounds like it was pretty effective. He said it was pretty effective. And O'Connor Radcliffe said that she put in about 20 words and that it was pretty effective, but I think you could put in the dinosaurs or some medical terms. Thank you very much. Thank you both sides for the very helpful arguments in this case. This case is submitted, and we are adjourned for the week.
judges: BERZON, TALLMAN, FRIEDLAND